SCOTT et al. v. QUEEN ANNE'S R. CO. et al.

(Circuit Court of Appeals, Fourth Circuit. May 5, 1908.)

No. 730.

1. RAILROADS—FORECLOSURE SALE—CLAIMS ENTITLED TO PRIORITY OVER MORT-GAGE.

A railroad mortgage provided that in case of default the trustee, at the request of 50 per cent. of the bondholders, should take possession of the road and all of the mortgaged property and operate or sell the same, as the bondholders might direct. The company became insolvent and was earning insufficient income to pay expenses, when a committee was appointed representing practically all of the bondholders and stockholders, and they deposited their bonds and stock. The committee took full charge and management of the property and operated the same until a sale was negotiated, having full authority to vote the stock deposited and to pledge the bonds or stock to secure money for operating expenses, and in fact exercised all of the powers which the trustee was given by the mortgage in case of default, which default occurred shortly after its appointment. A sale was negotiated by the committee for the benefit of the bondholders and stockholders who transferred their bonds and stock to the purchasers to be used in payment, receiving bonds and stock of the new company therefor. Such sale was consummated through a friendly foreclosure suit, and the decree confirming the same required the purchasers, they having knowledge of all the facts, to pay any claims which should be adjudged prior in equity to the mortgage. Held, that the management of the road by such committee was virtually that of the

bondholders, and that indebtedness incurred by it for expenses and supplies in operating the road after the bondholders might have taken possession by the trustee was superior in equity to the mortgage debt and entitled to priority of payment from the corpus of the property, and therefore to be paid by the purchasers.

2. SAME—OPERATING EXPENSES—ADVERTISING.

Bills for advertising the road, its trains, etc., contracted by the committee while in the management, were for legitimate operating expenses and entitled to priority as such equally as though they had been contracted by the trustee in possession.

Cross-Appeals from the Circuit Court of the United States for the District of Maryland, at Baltimore.

For opinion below, see 148 Fed. 41.

N. P. Bond, Edward Duffy, B. H. Hartogensis, and J. Kemp Bartlett, Jr. (Ralph Robinson and L. B. Keene Claggett, on the briefs), for appellants.

George Forbes, John C. Rose, Charles McH. Howard, and W. H. DeC. Wright (E. P. Keech, Jr., T. Wallis Blakistone, George Whitelock, David Fowler, Marbury & Gosnell, Roger W. Cull, John F. Williams, Foster & Foster, George R. Willis, J. Maulsby Smith, Charles P. Coady, Leon E. Greenbaum, Morris A. Soper, and Ritchie & Janney, on the briefs), for appellees.

Before GOFF and PRITCHARD, Circuit Judges, and BOYD, District Judge.

PRITCHARD, Circuit Judge. We have carefully considered the various assignments of error herein and the contention of appellants with respect to the same, and, after mature deliberation, are of opinion that the same are without merit. We have also considered the very able and exhaustive opinion of the learned judge who tried the cause below and fully concur in the views therein expressed, and are therefore of opinion that the decrees rendered are eminently proper ones in view of the law and the facts as found by the master.

It was evidently the intention of the bondholders that the securities committee should have full and complete control of the operation and management of the road in order that the same might be placed in a condition where it could be disposed of to the best advantage, and under these circumstances it would be inequitable and unfair to deprive the creditors whose claims are involved in this controversy, of their rights.

The opinion of the lower court, as we have said, is clear and comprehensive, and feeling as we do that the findings of fact are amply justified by the evidence, and that it is in harmony with the law of the case, we adopt the same as the opinion of this court. It reads as follows:

"The bill in this case was a general creditors' bill against the Queen Anne's Railroad Company, filed February 20, 1904. The bill alleges that the railroad company was largely indebted to the complainant for arrears of rental for three steamboats owned by the complainant, and leased to and used by the railroad company in the operation of its road, and alleges that the defendant company was also largely indebted to many other creditors for supplies and materials furnished for the operation and maintenance of its lines of rail-

roads and ferries, and that if the numerous creditors who were pressing for payment were allowed to enforce their claims by suits the result would be to deprive the railroad company of the means of operating its system of railroad and ferries and to destroy its power to earn revenue and to meet its obligations. The bill alleged that there was secured by a mortgage of the railroad three series of bonds: First, a series of first preference 5 per cent. bonds aggregating $330,000; second, a series of consolidated mortgage bonds, of which $865,000 were outstanding, and also a series of income mortgage bonds aggregating $600,000.

"The bill alleged that the corporation was insolvent, and that in order to protect the holders of the bonds as well as all the other creditors, it was absolutely essential that the railroad property should be kept and maintained and disposed of as an entirety and that any other course would result in the utter dissipation and waste of the corporate assets and property. The bill prays for the appointment of a receiver with power to operate the railroad and the ferries and steamboats, leased, controlled, and operated in conjunction with the railroad, with all the usual powers given to receivers in like cases to continue the business and maintain the integrity of the system of railroads and ferries.

"On the same day the defendant railroad company answered admitting the allegations of the bill and consented to the appointment of a receiver as prayed. On the same day the receiver was appointed as prayed. He was authorized to pay the interest on the $330,000 first preference bonds, all the rentals, taxes, and fixed charges necessary to prevent such defaults as would imperil the integrity of the system of railroads, and the debts for wages, services, materials, and supplies growing out of the operation of the railroad within a period not exceeding six months anterior to the date of the decree. The receiver proceeded to execute the powers given to him and operated the railroad and connecting ferries for about 12 months, when he delivered possession to the purchaser under the foreclosure sale.

"On November 26, 1904, the International Trust Company, the trustee named in the mortgage, filed a petition praying leave to file a bill of complaint for the foreclosure of its mortgage of the railroad property. Leave was granted, and on the same day the bill was filed asking for a decree for sale subject to the $330,000 first mortgage preference bonds. Upon the consent of the Queen Anne's Railroad Company a decree was entered as prayed. The receivership case and the foreclosure case were consolidated, and a sale was made and ratified for the sum of $480,000. The purchasers reported were Henry P. Scott and Nicholas P. Bond. Of the purchase price $30,000 was paid in cash and the purchasers also delivered to the trustee $865,000 of the first mortgage consolidated bonds, being the total amount issued, also $600,000 of the income bonds, and stock of the railroad company of the par value of $883,300, and the receiver was by order of court directed to deliver possession to the purchasers.

"The decree for sale provided that, in addition to the $30,000 to be paid in cash at the time of the sale, the purchasers should also pay, as the court might direct, such additional sums in cash as might be required to pay all liens or claims prior in equity to said mortgage (except the first mortgage preference gold bonds) to be determined by the court; the balance of the purchase money to be satisfied by the surrender of first consolidated mortgage bonds.

"The foreclosure sale and purchase were really the carrying into effect of an agreement which had been already made between the purchasers and the holders of the first consolidated bonds, and the holders of the income bonds and the owners of the stock by which they were all to receive from the purchasers securities in a new transportation company which was to consolidate under one management this railroad and other lines of transportation. The purchasers were fully cognizant of the previous history and management of the road and its securities and are to be treated as affected by any circumstances which would affect the bondholders themselves. There was no surplus income at any time, and no diversion, as the revenue was never in any one year sufficient to pay the running expenses, and if the claims now in controversy are paid they can only be paid out of the corpus of the mortgaged property.

"The solution of the question raised by the exceptions to the master's report depend upon whether or not there are present in this case special circumstances which give rise to a peculiar equity in favor of the claimants. It is quite clear from the facts appearing in the case that the purchasers at the foreclosure sale obtained the bonds with which they propose to pay for the property under such circumstances that whatever equities affected them in the hands of those from whom they were obtained now affect them at the hands of the purchasers.

"Since the case of Gregg v. Metropolitan Trust Company, 197 U. S. 183, 25 Sup. Ct. 415, 49 L. Ed. 717, decided by the Supreme Court in March, 1905, it is to be regarded as settled that supplies furnished to a railroad are not under any general rule, where there has been no diversion of income, entitled to precedence over a mortgage lien, recorded before the supplies were furnished, where there are no special circumstances affecting the mortgage bondholders' claim to priority. There having been no diversion in this case, the inquiry will be addressed to the question whether there were any special circumstances which ought to create an exception to the general rule.

"The mortgage foreclosed is dated March 1, 1901. It provides that, if the railroad shall fail to pay any semiannual installment of interest or fail to keep the property free from all taxes and other liens, then the trustee may take possession of all the mortgaged property, and, if requested in writing by 20 per cent. of any series of bonds and indemnified against liability, shall be bound to take possession subject to the right of a majority in amount of the outstanding bonds to countermand such action. Also, it is provided that in case of such default on the written request of 50 per cent. of all the bonds outstanding the trustee shall take possession of the railroad and property and all books, records, papers, accounts, and money of the railroad and all management and control thereof and manage and operate the same and receive the income thereof, and apply the same first to the management of the railroad and to making such repairs thereon as may be needed to keep the same in good working order, next to the payment of the interest and principal of the bonds, or, on written request of 50 per cent. of the bonds in default, to sell all the property. It is also provided that in every case of default the duty of the trustee should be subject to the right and power of the majority in amount of the bonds to direct and control the trustee's action, or to order more effectual remedies, and also that 50 per cent. or more of the bonds outstanding might at any time remove the trustee and appoint a new one.

"It was the summer excursion business of the railroad and its steamers which was depended upon for revenue. It was found, however, after the summer of 1902 that there had accumulated a large floating debt, and that the financial condition of the railroad was altogether bad. The holders of the first consolidated mortgage bonds and the income bonds were driven to act in order to keep the railroad a going concern until they could get a purchaser for it. The owners of the bonds were very largely also the owners of the stock, and practically they were the owners of the road subject to the $330,000 of preference bonds. The semiannual interest coupons on the bonds due September 1, 1902, were paid, but it was certain that default would be made in the payment of the coupons falling due March 1, 1903, and something had to be done to preserve the credit of the railroad and keep it going. To attain this end the holders of the first consolidated mortgage bonds, the holders of the income bonds, and the holders of the stock united together and on November 29, 1902, appointed a committee which became known as the 'Securities Committee.' This committee from the first represented 75 per cent. of the bondholders and stockholders, and during its active existence all the bondholders and substantially all the stockholders made themselves parties to the agreement by which the committee was appointed.

"This committee of five entered upon the duty of preserving and maintaining the railroad as a going concern. They held their first meeting on December 6, 1902, and, as appears from their minute book, between that date and February 21, 1904, when the receiver was appointed by this court, they held 42 meetings. During that time the directors of the company held but one meeting, and the stockholders one meeting. It is to be seen from their minutes, and from what they actually did, that the committee in exercising the

powers given it by the agreement under which it was appointed exercised supreme control over the railroad and its property and directed everything that concerned it and give to it the credit which kept it going. By the terms of the appointment the depositors of the securities gave to the committee power to represent the depositors in any measure or action of any kind necessary or proper, to accomplish the purposes of their appointment, to superintend the operation of the railroad by its officers and directors, and to confer with them as to the management and operation of the road with the same powers as the depositors might have, to vote all shares of the capital stock in order to enforce official action on the part of the directors, and to select and elect directors in accordance with the opinion of the committee, and to negotiate a sale of the securities and property and franchise of the company; a sale, however, before consummated to be submitted to a meeting of the security holders. The committee, for the purpose of raising money to operate the road most effectually and to provide new equipment and additions, were authorized to pledge the securities deposited, and, if unable to sell the property, were authorized to form a new company to take it over, also to institute proceedings to foreclose the mortgage or to postpone such proceedings.

"As the committee had all the powers that the bondholders had and all the powers of the stockholders, with the power to change the trustee designated by the bondholders' mortgage, and to change the directors, and as the purpose of their appointment was to keep the road running until a reorganization or sale could be effected, it is quite clear that they could, in substance, do whatever any or all of the interest they represented could do. When we examine the minutes of the meetings of the committee and the testimony to see what they really did do, I think it becomes apparent that they in fact managed the railroad as persons having absolute control and possession would manage it. The committee authorized the purchase of additional passenger coaches and a locomotive. They negotiated with and employed a new general manager; and when his management proved disappointing to them they discharged him. They took in charge matters connected with the terminals at Queenstown and Love Point and authorized contracts with regard to them. They authorized the purchase of new railroad ties. They investigated the causes of an accident to the steamer Queen Anne and directed the painting of the steamer Caroline. They authorized the compromise of disputed bills of the Dry Dock Company. They authorized contracts to be made for the supplies of coal. They authorized the purchase of a barge and additional engines, the building of a new station. They gave orders for a plan for lighting certain piers and for the erection of a derrick. Finally, after the committee had been thus in control of the property from January, 1903, for over a year, they negotiated with the present purchasers for a sale to them upon an agreed plan, and instructed their counsel in connection with the counsel of the purchasers to institute a suit for a friendly receiver to the end that the plan of sale which had been agreed upon should be faithfully carried into effect. The suit was instituted, and a receiver recommended, and, after a conference between the securities committee and the intending purchasers of the road, was appointed.

"It appears that the general manager selected by the securities committee reported directly to the committee, and that after the committee took hold and were furnishing the money to keep the road running and had authority to determine, subject to the ratification of the bondholders the terms of the sale, the board of directors as such practically abdicated; indeed, they were helpless to do anything. The chairman of the securities committee, Mr. Oler, testified that the committee practically took over the management of the road, and, as it had never been able to meet its expenses, the committee arranged to raise money to carry it along and keep up its credit with the people who sold it its current supplies, and that the expenditures were reported to the committee and controlled by it.

"By the terms of sale finally agreed upon for each consolidated mortgage bond, the holder was to receive $1,200 in stock of the Maryland, Delaware & Virginia Railroad Company, and for each income bond $50 of the said stock, and the holder of each share of the old stock was to receive $1 of the said new stock. It thus appears that what the securities committee did was just

what the trustee under the mortgage by direction of the bondholders would have had the right to do, viz., to take possession of the road and run it, making repairs and keeping it in running order and finally to sell it. When the trustee takes such possession, the debts incurred by the trustee in running the road are to be paid in preference to the lien of the bondholders whose agent the trustee is.

"In this case the situation was complex. There was an impending possibility that, its credit being exhausted, its business not paying its running expenses, the whole system of railroad and ferries might collapse, and the consolidated bondholders might lose everything. It was thought best that a committee composed of persons who held the bonds should endeavor to meet the difficulties, so the committee took charge, instead of the trustee under the mortgage. They worked faithfully and sedulously. They held meetings and kept careful minutes of their proceedings showing what things they ordered to be done and what contracts they directed should be made, what persons should be employed or discharged, and they borrowed money and put it into the treasury. Many and difficult questions of policy and detail were discussed and decided by them. They did sustain the credit of the company and did keep the road running and did effect a sale in the results of which the bondholders and stockholders participated, and they carried the transaction through by means of a nominal sale made by the court's decree, but in reality upon the terms previously arranged by the committee with the purchasers. It should be stated in justice to the gentlemen composing the securities committee, themselves large bondholders, and whose names undoubtedly gave financial standing to the railroad, that there is nothing in the case to indicate that they did not intend that the creditors who furnished the supplies and materials while they were managing the road should be paid out of the proceeds of the property. They represented the bondholders and were themselves bondholders, and they represented stockholders, but the bondholders alone had any substantial interest, as the company was insolvent and earning no income. With no adequate income out of which to pay the running expenses, what was there to meet the deficit except the proceeds of the property? To suppose that the committee were for over a year lending themselves to a scheme by which persons furnishing operating supplies to a general manager appointed by them and acting for them were to be left unpaid is to do them an injustice. In making the contract for sale of the property the purchasers were told that there was existing a floating debt of the railroad company for operating expenses. The existence of such a floating debt was mentioned in the agreement of sale, dated February 15, 1904, and an itemized statement was agreed to be furnished, although it does not appear that it was ever insisted upon.

"The contract of sale of February 15, 1904, begins by reciting the amount and nature of the outstanding securities of the Queen Anne's Railroad Company, including this recital: 'And whereas the said railroad company is indebted to various persons [including its indebtedness to said committee] as shown by the statement marked "A" herewith attached.' Then, after reciting that it is the wish of all the parties to the agreement that a new corporation shall be formed which shall acquire the said railroad property and other property and shall be bonded and capitalized as therein stated, it is further recited: 'And whereas it is the desire of the parties of the first part [that is, the securities committee and all the holders of securities of the Queen Anne's Railroad who joined in the contract of sale with the committee] to facilitate in every way the formation of such new corporation or the reorganization of the present Queen Anne's Railroad corporation, to the end that when the same is formed or reorganized and securities now owned by them shall be exchanged for the new securities in the name and on the terms hereinafter set forth.' 'And whereas the said parties of the second part [the purchasers] have agreed that they will endeavor within a reasonable time as hereinafter mentioned to carry the above purpose into effect; provided that the said parties of the first part will contract and agree to take the new securities of the character and to the amount hereinafter designated in exchange and full payment for the various bonds and stocks of the Queen Anne's Railroad now held by them, if and when the said parties of the second part shall be able to

162 F.—53

deliver said new securities which said parties of the first part have agreed to do. Wherefore these presents are executed.'

"I think it clearly appears: That this whole reorganization arrangement for the benefit of the bondholders and stockholders of the Queen Anne's Railroad Company was one which could not be lawfully carried out to the exclusion of and destruction of the rights of the creditors of the road for operating expenses incurred by the securities committee in effecting the arrangement. That the agreement appointing the securities committee, and by which they acquired control of the bonds which they sold to the purchasers of the road, contemplated that the deficit in operating expenses should be borne by the bondholders, as is shown by a provision in respect to a plan of reorganization afterwards modified, in which it was provided that $135,000 of new bonds should be applicable to 'the repayment of the advances, loans, and indebtedness which may be made and incurred by said committee in carrying out the terms and purposes of this agreement, whether such indebtedness be incurred for the purpose of operating said railroad company in the most effective manner as hereinbefore set out, or providing new equipment and additions to the present property, or in providing expenses for the proper and effective carrying out of the objects and purposes of this agreement.' The scheme contemplated when the $135,000 of new bonds were specifically appropriated to debts and expenses could not be consummated, and in consequence the property remained in the hands of the committee and the receiver much longer than was anticipated, and the deficit grew larger. But, none the less, the effect was necessarily to pledge the deposited bonds for the debts incurred by the securities committee in operating the road as they proceeded to do after they accepted the appointment. All these matters were perfectly well known to the purchasers of the bonds and of the railroad. The securities committee was in fact and in effect the agent of the bondholders, and the debts they contracted in doing what they were appointed to do were in effect the debts of the bondholders.

"The default in the payment of interest on the consolidated bonds foreseen at the time of the appointment of the securities committee on November 29, 1902, to be inevitable, took place March 1, 1903. Upon that default happening, the trustee under the mortgage which secured the bonds was by it authorized to take possession upon request of 25 per cent. of the holders of the consolidated bonds. As the securities committee did in fact in the execution of their duties proceed to take over and operate the road, the responsibility of the bondholders for their action should fairly date from that point of time when the bondholders themselves through their trustee might have taken possession, viz., the first of March, 1903, and I think it follows that the bonds and the property on which they were secured are chargeable with the operating expenses of the road incurred from and after March 1, 1903.

"It follows that the exceptions to the master's report based upon the disallowance of priority to the operating expenses incurred after March 1, 1903, are sustained.

"Bills for advertising: I can see no reason for excluding them. The road, although hopelessly insolvent, was kept running by the bondholders for two purposes: First, to attract a purchaser; and, second, to obtain as much income as it could be made to produce. To do this public notice by advertisement of the running of trains was essential, and it seems to me in such a case as this the cost of the advertisements is a proper expense legitimately incurred to keep the road running.

"The findings of the master with regard to the validity of the several claims of creditors of the company, apart from their question of priority over the mortgage debt, appear to me to be correct, and they all appear to me to be for expenses for which the trustee under the mortgage would have been liable if the trustee by direction of the bondholders had formally taken over the road and run it, and therefore they are such as the bondholders are liable to pay; they having, in substance, done indirectly the same thing through the securities committee."

For the reasons hereinbefore stated, the decrees of the Circuit Court appealed from are affirmed.